[No. 35361.  Department Two.  May 18, 1961.]

THE STATE OF WASHINGTON, *Appellant,* v. HARCOURT M. TAYLOR *et al., Respondents.*[*]

*Reported in 362 P. (2d) 247.

*The Attorney General, Philip R. Meade* and *Louis Prediletto, Assistants,* for appellant.

*Hawkins & Loy,* for respondents.

FINLEY, C. J.—In 1939, by means of a trust deed, the J. M. Perry Institute of Trade, Industry and Agriculture was created to establish, maintain, and endow an institution to provide technical training for specified vocations. The trust instrument requires the trustees to keep full and correct accounts, to direct an audit of their accounts at the end of each fiscal year, and to publish a condensed general statement of the condition of the assets of the trust immediately thereafter in a local newspaper. There is no allegation that the trustees have failed to follow specific requirements of the trust instruments.

In 1958, the Attorney General wrote to the trustees advising them that he had learned of the existence of the Perry Trust; that he was charged with the duty of representing the public in matters concerning charitable trusts; and that

". . . we find it necessary to request from you, as trustees, a complete history of the above trust, including, so far as available: (1) Records of all principal income, and disbursements of the trust, to the present time; (2) records of all property held in trust, real and personal, and assets, and transactions involving the same, to the present time; (3) records of any substantial changes in the administration of the trust; (4) records of any legal action involving the trust, since its inception; and (5) information as to the present status and operation of the J. M. Perry Institute.

"In addition, we request your notifying this office in the future, of any changes mentioned in item (3), and of any pending legal action pertaining to the trust."

The trustees declined to furnish the requested information, stating that they questioned the authority of the Attorney General to demand it in the absence of a complaint of mismanagement or breach of trust.

The Attorney General thereupon brought this action for an accounting. The trial court sustained the trustees' de-

murrer to the complaint and dismissed the action. The Attorney General appeals.

It is not questioned that the trust is of a charitable nature. *Peth v. Spear* (1911), 63 Wash. 291, 115 Pac. 164. Nor is there any dispute about the authority of the Attorney General to bring an action to enforce a charitable trust where there is an allegation of mismanagement or breach of trust. *Kenney Presbyterian Home v. State* (1933), 174 Wash. 19, 24 P. (2d) 403. The primary issues are (1) whether the state can maintain this action for an accounting in the absence of facts constituting mismanagement or a breach of trust, and (2) whether the letters from the Attorney General to the trustees are sufficient to constitute a demand for a full scale accounting.

It has long been recognized that at common law the Attorney General has the duty of representing the public interest in securing the enforcement of charitable trusts. *Attorney General v. Mayor of Dublin* (1827), 1 Bligh (n.s.) 312, 4 Eng. Rep. 888. Blackstone states the source of the Attorney General's power as follows:

"The king, as *parens patriae,* has the general superintendence of all *charities*; which he exercises by the keeper of his conscience, the chancellor. And therefore, whenever it is necessary, the attorney general, at the relation of some informant, (who is usually called the *relator*) files *ex officio* an information in the court of chancery to have the charity properly established." 3 Blackstone, Commentaries 427.

Although some courts in the United States do not subscribe to the doctrine of *parens patriae* as being the source of the Attorney General's authority in relation to charitable trusts (see, *e.g., Powers v. First Nat. Bank of Corsicana* (1942), 138 Texas 604, 161 S. W. (2d) 273), it is generally recognized in this country that the authority of *parens patriae* is *exercised* by the Attorney General. *The Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States* (1890), 136 U. S. 1, 34 L. Ed. 478, 10 S. Ct. 792; *Wallace v. Graff* (1952), 104 Fed. Supp. 925; *In re Quinn's Estate* (1958), 156 Cal. App. (2d) 684, 320 P. (2d)

219; *In re Katz' Estate* (1956), 40 N. J. Super. 103, 122 A. (2d) 185.

The parties in the instant case do not agree on the scope of the Attorney General's authority to bring an action. The trustees contend that no action may be brought without an allegation and some showing of mismanagement, expiration of trust purpose, or some similar ground for interference with the trustees of a charitable trust. The Attorney General, on the other hand, argues that, since the public is the beneficiary of a charitable trust, and since he is the representative of the public in such matters, it follows that he can maintain this action for an accounting to protect the interest of the beneficiary.

Our state constitution provides that

"The attorney general shall be the legal adviser of the state officers, and shall perform such other duties as may be prescribed by law." Washington Constitution, Art III, § 21.

In RCW 43.10.030, the legislature has provided that

"The attorney general shall:

"(1) Appear for and represent the state before the courts in all cases in which the state is interested; . . ."

The foregoing authority certainly does not embody a clear command to the Attorney General to enforce charitable trusts. However, we are convinced that, inasmuch as the proper management of charitable trusts is a matter of public concern, this is a case in which the state is interested. In *Kenney Presbyterian Home v. State, supra,* the court described the interest of the state and the function of the Attorney General as follows:

"The charitable trust created by Mrs. Kenney is of public concern—it is a public charity; hence, only the state can invoke the superintending power of the courts over the administration of the trust.

" 'A charitable trust is of public concern and the attorney-general is the protector of the interests of the public, or, what is the same thing, of the indefinite and fluctuating body of persons who are the cestui que trust. Unless, however, a gift is definitely to a charity such as equity recognizes, and one more or less public or general, there is no right

in the public to serve as a ground for intervention on the part of the attorney-general. If it is of a public character, not only may he intervene in an action brought for the construction of the will, but he is a proper party defendant as representing the public interests, for no final and conclusive settlement could be had unless the state were represented. Moreover, he is the proper person to institute proceedings for the enforcement of a public trust or charity, for which purpose he may file an information either on his own motion or on the relation of any party concerned. In fact, the attorney-general is the only one who can properly invoke the superintending power of the courts over the administration of such trusts.' 2 R. C. L., p. 923, § 12."

RCW 43.10.030(1) does not, of course, authorize the Attorney General to bring an action in the courts if no cognizable common law or statutory cause of action can be stated. We must, therefore, determine if the Attorney General stated a cause of action.

◼ Although there seems to be an absence of case authority directly on the point, it appears to be generally recognized that the duties of the trustee of a charitable trust are substantially the same as those of the trustee of a private trust. *City of Boston v. Curley* (1931), 276 Mass. 549, 177 N. E. 557; *Attorney General ex rel. Nesmith v. City of Lowell* (1923), 246 Mass. 312, 141 N. E. 45; *Nelson v. Cushing* (1848), 2 Cush. (Mass.) 519; *Murphey v. Dalton* (Mo. 1958), 314 S. W. (2d) 726, 67 A. L. R. (2d) 1278; *Bible Readers' Aid Society v. Katzenbach* (1925), 97 N. J. Eq. 416, 128 Atl. 628; *Clevenger v. Rio Farms, Inc.* (Tex. Civ. App. 1947), 204 S. W. (2d) 40; 2A Bogert, Trusts and Trustees, § 391; 2 Restatement, Trusts (2d ed.), § 379; 4 Scott, Trusts, § 379. In 2 Restatement, Trusts, *supra,* the rule is stated in the following language:

". . . The duties of the trustees with respect to the administration of charitable trusts are the same as the duties of the trustees of private trusts, except that the duties of trustees of charitable trusts are ordinarily not owed to or enforceable by individual beneficiaries, but are enforced at the suit of the Attorney General. (See § 391.)

"The trustees of a charitable trust, like the trustees of

a private trust, are subject to duties . . . to keep and render clear and accurate accounts with respect to the administration of the trust (see § 172) to furnish complete and accurate information as to the nature and amount of the trust property (see § 173) . . ."

The converse of the duty of the trustee to render an accounting and to furnish information is the right of the beneficiary or his representative to demand such an accounting or information. The philosophy behind the rule that a trustee must account and furnish information to the beneficiary is stated by Professor Bogert as follows:

". . . The cestui is the beneficial owner of the trust property, in whole or in part. The trustee is a mere representative, whose function is to attend to the safety of the trust property and procure its avails for the cestui in the manner provided by the trust instrument. That the settlor has created a trust and thus required that the cestui enjoy his property interest indirectly does not imply that the cestui is to be kept in ignorance of the nature of the property and the details of its management. If the cestui is to be able to hold the trustee to proper standards of care and honesty and procure for himself the benefits to which the trust instrument and the doctrines of equity entitle him, *he must know of what the trust property consists and how it is being managed.*

"From these considerations it follows that *the cestui is entitled to demand of the trustee all information about the trust and its execution for which he has any reasonable use.* If the beneficiary asks for material information about the terms of the trust, its present status, past acts of management, the intent of the trustee as to future operation, or other incidents of the operation of the trust, and these requests are made at a reasonable time and place, and not merely vexatiously, it is the duty of the trustee to give the cestui the facts for which he has asked. Furthermore, the trustee must permit the cestui to examine the account books of the trust, trust documents and papers, and trust property, when a demand is made at a reasonable time and place, and such inspection would be of benefit to the cestui. . . ." (Italics ours.) 4 (Part 2) Bogert: Trusts and Trustees 233, § 961.

It seems to us that Professor Bogert's reasoning is at least as pertinent to the management of charitable trusts

as it is to private trusts. However, in the case of most charitable trusts, it would be unlikely that any person or group of persons would be directly interested or sufficiently affected to be accorded legal standing or status, such as in the case of beneficiaries of a private trust, to investigate and to do something about mismanagement by the trustees.

In the case at bar the trustees emphasize that visitation rights are limited exclusively to the trustor by that portion of the trust instrument which reads:

"The right is hereby reserved to the trustor to exercise all the powers of visitation conferred by the common law upon trustors of charitable trusts, *but such powers shall not extend to her heirs or to any other person or official.*"

Professor Scott states that ". . . where property is given to trustees for charitable purposes, rather than to a charitable corporation, there is no such visitorial power. . . ." (4 Scott, Trusts, § 391.) While we are not inclined to agree that the existence of visitorial power should turn on mechanics of incorporation (from the record, it does not appear that the Perry Institute has been incorporated), we do take note of Professor Bogert's observations on the power of visitation:

". . . It seems to be a relic of earlier times which has not been expressly abolished by statute in most states and has been occasionally recognized by decision. It is not believed, however, that it is a feature of charitable trust administration which is extremely practical or desirable under present conditions.

". . . [T]he Attorney General is capable of enforcing the rights of the public and holding the managers of the charity to strict performance. The better doctrine would seem to be that the Attorney General may, on his own motion, or on the information and relation of any private citizen, sue in equity to compel the managers of a charitable corporation to abide by its charter and by the terms of gifts to it, . . . So long as the Attorney General is available for inspecting and observing the operation of the charitable corporation, and for holding the managers to lawful acts of management, all those sentimentally or financially interested in the proper operation of the corporation would seem to have adequate relief without the use of the visitation right.

"Certainly where property is held under a charitable trust, either by a corporate trustee or a private person, the Attorney General affords a substantial check on the conduct of the trustee which minimizes the need of inspection by the settlor, his successors, or his appointees." 2A Bogert: Trusts and Trustees 287, 292, § 416.

Upon either of the above grounds, the respondent trustees' reference to visitation powers seems to us unavailing. *Kenney Presbyterian Home v. State, supra,* involved a corporation and is not controlling.

■ Professor Bogert also comments on the duty of trustees to render formal accounts in the courts:

"The trustee also owes his cestui a duty to render at suitable intervals and at the end of the trust a formal and detailed account of his receipts, disbursements, and property on hand, from which the beneficiary can learn whether the trustee has performed his trust and what the present status of the trust property then is. The trustee can be compelled by the court of chancery to perform this duty by presenting an account in that court, where it can be subject to the scrutiny of the court and its officers, as well as to criticism by the cestui and other interested parties. It lies within the discretion of the court, if there is no relevant statute, to order an account of the trustee or his successor in interest, at the suit of any interested party, at such a time as seems reasonable to the court in view of the time which has elapsed since the last account and the nature and status of the particular trust.

"In order to succeed in such a suit for accounting, it is not necessary that the cestui allege that there is any sum immediately due him under the trust, or that the trustee is in default. The suit is one to obtain information concerning the course of administration, no matter what the present status is." 4 (Part 2) Bogert: Trusts and Trustees 243, § 963.

See, also, *Baydrop v. Second Nat. Bank* (1935), 120 Conn. 322, 180 Atl. 469; *Wallace v. Malooly* (1954), 4 Ill. (2d) 86, 122 N. E. (2d) 275; *Wylie v. Bushnell* (1917), 277 Ill. 484, 115 N. E. 618; *United Towns Bldg. & Loan Ass'n v. Schmid* (1952), 23 N. J. Super. 239, 92 A. (2d) 844; 2 Beach, Trusts and Trustees, § 682; 1 Restatement, Trusts (2d ed.), §§ 172, 173.

We conclude, on the basis of the foregoing reasoning

and authority, as a general proposition, that the Attorney General, as representative of the public and particularly of those individuals who may be specially benefited, has standing to maintain an action against the trustees of a charitable trust to obtain information concerning the course of administration, provided that the demand is not unreasonable in view of the circumstances and the nature and status of the particular trust.

The trustees argue that under the trust deed itself they are required to publish an account annually and that this requirement, which has been faithfully observed, relieves them of any duty of rendering a further accounting. The trust instrument states that

"The trustees shall keep full and correct accounts, with vouchers for disbursements, and shall at the end of each fiscal year direct an audit of their accounts to be made by a certified public accountant who has been in business for a period of at least five (5) years prior thereto, and shall publish a condensed general statement of the condition of the trust assets, certified to by such accountant, immediately thereafter at least once in a daily newspaper of general circulation in Yakima County, Washington."

It is true that an instrument creating a trust may in some cases relieve the trustee of the duty of making a formal accounting or may provide that the accounting may be made to a particular person whose approval shall be conclusive. 1 Restatement, Trusts, § 172, comment *d*. The Perry trust, however, in requiring annual publication of account, did not expressly relieve the trustees of the necessity of accounting at other times. This distinguishes the instant case from *Wood v. Honeyman* (1946), 178 Ore. 484, 169 P. (2d) 131, 171 A. L. R. 587, upon which the trustees rely. Recognition of the necessity for information regarding the management and operation of charitable trusts, in order that they may be properly enforced, compels us to conclude that, while the duty of trustees to account and to furnish information may be curtailed by the trust instrument to an extent we need not here identify, such curtailment must be expressly and unambiguously declared by the settlor.

■ The requisites of pleading in an action for an accounting were described in *Seattle Nat. Bank v. School Dist. No. 40* (1898), 20 Wash. 368, 55 Pac. 317, as follows:

"In general, a complaint for an accounting must show by specific averments that there is a fiduciary relation existing between the parties, or that the account is so complicated that it cannot conveniently be taken in an action at law. And it must allege that the plaintiff has demanded an accounting from the defendant, and the latter's refusal to render it, in order to state a cause of action."

See, also, *Starks v. Field* (1939), 198 Wash. 593, 89 P. (2d) 513. The Attorney General suggests that the rule stated in the *Seattle Nat. Bank* case, *supra,* was later modified so as not to include the necessity of a prior demand in the case of a bill in equity for accounting. We have carefully reviewed the cases cited by the Attorney General in support of his argument and conclude that the rule has not been changed by our later cases.

■ The letters sent by the Attorney General to the trustees do not, in our view, constitute a reasonable and proper request for an accounting. The letters sought information about the trust, such information to be rendered in a form which we believe the trustees quite properly found to be excessively burdensome. This point will be elaborated below. The complaint filed by the Attorney General prayed for much more extensive relief, in the sense of disclosure and mechanics, than the letter suggested; *i.e.,*

". . . that the court enter an order requiring defendants to give a full and complete accounting of the management and disposition of all trust property, of whatever nature, from commencement of said trust to the time at which said order is issued;

"Further, the plaintiff prays that, after the accounting, the court grant such other and further relief as the court may deem proper."

We do not believe a request, unreasonable in certain aspects, for *some* information can be construed to have been a demand for a full scale accounting covering every facet of operation of the trust from the time of its inception.

The desirability of the prior-demand requirement is illustrated by *Wiegardt v. Becken* (1941), 8 Wn. (2d) 568, 113 P. (2d) 60, 143 A. L. R. 1208, in which a long and complicated trial would have been simplified had the parties earlier agreed on several items about which, during the trial, they found themselves to be in accord. The letters from the Attorney General do not seem to us to have been an invitation to enter into such a salutary preliminary procedure. We agree with the trial judge that the letters seeking information about the operation of the trust did not give notice that a full scale accounting was intended and, for that reason, fell short of the requirement of a demand for an accounting prior to the commencement of the action.

Much space in the briefs and much time during the oral argument were devoted to the question of the authority of the Attorney General to acquire items of information requested in his first letter to the trustees. We hesitate to extend this opinion further, but some additional discussion is desirable to obviate possible misunderstanding.

█ In his letter the Attorney General requested *records* of *all* principal income and disbursements; *records* of *all* property and transactions relating thereto; *records* of substantial changes in administration, and *records* of legal actions. We do not think the duty of the trustees to furnish information extends so far. The duty to furnish information certainly includes a reasonable opportunity to examine the books and records (and, under some circumstances, a requirement to furnish a limited amount of information in written form), but not an unreasonably extensive duplication of all the books and records.

Many states have recognized the need for stricter enforcement of charitable trusts to avoid waste, mismanagement and neglect on the part of *some* trustees. Following the lead of England—and, in this country, New Hampshire —some state legislatures have enacted statutes that require the registration of charitable trusts and filing of periodic reports (usually with the Attorney General). Some Attorneys General have been given authority to promulgate rules for the transmission of information and to conduct

investigative hearings. In a number of states, personnel available for the enforcement of charitable trusts has been expanded. A detailed discussion of the problems and recent legislative activities may be found in Bogert: State Supervision of Charities, 52 Mich. L. Rev. 633. See, also, 4 Scott, Trusts, § 391.

While we can appreciate the interest and efforts of the Attorney General of Washington relative to effective enforcement of the duties and responsibilities of trustees of charitable trusts in this state, we must conclude that in the absence of statutory authorization he cannot require of the charitable trustees the continuing communication of information and unreasonable duplication of records and information instanced by the letter of demand. The Attorney General's power to enforce charitable trusts is co-extensive with, but no broader than, the power of enforcement enjoyed by beneficiaries of private trusts.

For the foregoing reasons, the judgment of the trial court sustaining the demurrer and dismissing the complaint in the instant case is affirmed.

HILL, WEAVER, ROSELLINI, and FOSTER, JJ., concur.