FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 20, 2024

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 20, 2024

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 101205-5 |
| | ) | |
| Appellant, | ) | |
| | ) | EN BANC |
| v. | ) | |
| | ) | |
| CITY OF SUNNYSIDE; AL ESCALERA, | ) | Filed: June 20, 2024 |
| in his official and individual capacities; | ) | |
| MELISSA RIVAS, in her official and | ) | |
| individual capacities; CHRISTOPHER | ) | |
| SPARKS, in his official and individual | ) | |
| capacities; JOEY GLOSSEN, in his official | ) | |
| and individual capacities; and JAMES | ) | |
| RIVARD, in his official and individual | ) | |
| capacities, | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

MONTOYA-LEWIS, J.—The Washington State attorney general brought suit against the city of Sunnyside (City), challenging the manner in which the City operated its crime-free rental housing program (CFRHP). The attorney general initiated this action due to the concern that the program was being used to extrajudicially evict tenants and that such evictions impacted renters who are Latinx,

women-headed households, and families with minor children. Such evictions appear to have occurred without the due process afforded to renters under the state and federal constitutions and the Residential Landlord-Tenant Act of 1973 (RLTA)[1] and may have disparately impacted protected classes in violation of state and federal laws against discrimination.

The City argues that the attorney general lacks the authority to act in this manner because the scope of that authority under RCW 43.10.030(1) limits the attorney general's ability to act to matters that impact more people than those impacted by the CFRHP. The defendants brought summary judgment on multiple claims and the trial court granted the defendants' motion. Although the court did not specifically state the basis for the grant of summary judgment, we review each ground raised by the defendants and reverse and remand on all claims except the RLTA claim; on that claim we agree with the trial court and affirm the grant of summary judgment.

## FACTS AND PROCEDURAL HISTORY

A.   Factual Background

1.   The City's CFRHP

The City established the CFRHP in 2010, stating the "goal of reducing crime and improving the quality of life for residents of rental housing." SUNNYSIDE

---

[1] Ch. 59.18 RCW.

MUNICIPAL CODE (SMC) 5.02.030(A). The legislature authorizes CFRHPs for the benefit of "the public health, safety, and welfare," subject to certain requirements. RCW 35.106.005, .020. CFRHPs should be "designed to reduce crime, drugs, and gangs on rental housing premises under the supervision of the local police department" without preventing people from obtaining housing simply due to criminal history. RCW 35.106.010(1), .005. Under the City's CFRHP, participating landlords must require renters to sign a "crime-free lease/rental agreement addendum" (agreement addendum), which lists crimes that constitute material breach if committed or permitted by the resident on or near the rental property. SMC 5.02.030(A)(3). If the City's police believe a crime has been committed at the residence, they will issue a notice of noncompliance to the landlord. SMC 5.02.030(F). The landlord then must serve a notice to comply or quit to the residents "and pursue all remedies . . . to terminate the tenancy and evict the residents." *Id.* Though the ordinance requires landlords to issue this notice within five days upon notification by the police, the agreement addendum and the landlord declaration of participation provide a time frame of only three days, and the latter states that landlords must serve eviction notices without opportunity to comply or quit. *Compare id.*, *with* SMC 5.02.030(A)(3), *and* 2 Clerk's Papers (CP) at 494.

While landlords are typically required to pay an annual fee for a rental housing license, the City waives this fee for landlords who participate in the CFRHP. SMC

3

5.02.020(B), (D). If a landlord fails to comply with the CFRHP, the City will revoke the license and charge the landlord 110 percent of the fee plus interest. SMC 5.02.020(D). Failure to maintain a residential housing license is also a civil infraction punishable by a fine of $1,000. SMC 5.02.070. However, in the information it provides to landlords, the Sunnyside Police Department describes this as a misdemeanor punishable by the fine "and/or a jail sentence of up to 90 days." 2 CP at 495.

The Washington State Attorney General's Office first raised concerns about the operation of the program in 2017. According to the City, it "took steps to address the concerns," including conducting an annual training on the CFRHP for police officers. 1 CP at 151. Police training records indicate that a CFRHP training was given once in 2011 and not offered again until 2019. Those records show that only two of the five respondent officers participated in those trainings.

As a matter of practice, the police department has placed one officer in charge of the CFRHP; other officers would refer CFRHP-related matters to them. Respondent Melissa Rivas[2] has been the officer in charge of the CFRHP since 2010. Rivas states she has received training on both the RLTA and the CFRHP ordinance.

---

[2] Respondents indicate that Melissa Rivas has changed her last name to "Heeren"; she is described by both names in the record. *See* Resp't City's Resp. Br. at 14 n.3. For clarity, we refer to her as "Rivas," consistent with the title of the case, as no party has moved to change the case title. *See* RAP 3.4. No disrespect is intended.

4

She maintains that she understands it is not the role of police to evict anyone and she has never done so.

The other individual respondents include Police Chief Al Escalera, police officers Christopher Sparks and Joey Glossen, and code enforcement officer James Rivard. Like Rivas, the officers state they understand they do not have authority to evict tenants and claim they have not done so. As chief of police, Escalera is responsible for establishing the City's customs and policy with respect to the CFRHP, though he did not regularly review CFRHP matters.

The City has paused enforcement of the CFRHP pending this litigation.

> 2.     Tenants' Experiences

The State argues the respondents have enforced the CFRHP unlawfully from 2014 to 2019, demonstrated, in part, by the individual experiences of numerous tenants. The State offers declarations of nine tenants and a landlord as evidence of this pattern.

*Angelita Guizar and family*

Angelita Guizar was living in rental housing with her three children when Rivas and Rivard came to her home and arrested her daughter's friends. Guizar recalls Rivard said she and her children would have to move out of the house in three days. Rivas claims Guizar received a civil infraction for nuisance, unrelated to the CFRHP. But Guizar recalls the landlord told her she "would have to move out of

the house, because otherwise he would get in trouble with the police," and police followed up with her afterward and reiterated that she had to move out. 2 CP at 826. The family moved out to "compl[y] with the Code Enforcement Officer's [Rivard's] orders." *Id.* at 827. They were able to move in with a friend, where Guizar and her three children had to share a single room.

*Eliseo Vargas*

Eliseo Vargas lived alone in a rental house in Sunnyside. When his daughter visited, police came to his home with a warrant and arrested her. Vargas recalls Rivas returning two days later to tell him he could no longer live there. His landlord said he had to leave the house in a month and "she had to ask [him] to leave because the police told her to." *Id.* at 791. He never received a notice of eviction, but a police officer came to check if he was still there on the day of the one-month deadline. Vargas left, and he slept many nights in his truck. He was not able to find housing in Sunnyside and had to move to Prosser.

*Yvonne Chagolla and family*

Yvonne Chagolla and her family were living in a rental home when Rivas responded to a domestic violence call. There were no criminal charges against either Chagolla or her husband for that incident, but according to Chagolla, Rivas told them "there had been too many domestic violence reports coming from [their] house" and they had to be evicted. *Id.* at 799. The next day, the landlord gave her husband "a

document that said [they] had to leave the house." *Id.* Chagolla thought they were evicted, so she left with her daughter—they had to sleep in her truck.

Chagolla's landlord, Isabel Villa, believed the police were forcing her to evict Chagolla's family because of domestic violence, which "did not feel right" to Villa. *Id.* at 807. She suggested talking to Chief Escalera; Chagolla recalls Escalera said that Rivas "was in charge of the program and that he couldn't do anything to help." *Id.* at 799. Escalera denies saying so. Though Chagolla thought she was evicted because of the CFRHP, Villa did not pursue an eviction action against the family, and Chagolla eventually returned to the home.

*Heather and Rodney Francis*

Heather and Rodney Francis received a three-day eviction notice from their landlord after a police search of their rental home. It appears that neither of them was charged with a crime related to this search, but Rivas claims the Francises had prior criminal histories, and she told the landlord she would issue a CFRHP citation "if the problems at the residence persisted." 1 CP at 142. According to the Francises, Rivas and Rivard threatened the landlord with a $1,000 fine if she did not evict them. Three days later, Rivas came to the Francises' house and told them they needed to leave the premises and leave town by midnight, giving them just eight hours to do so. They recall she said they "were gang members and druggies and that was why

she was ordering [them] to leave," and then she stayed to ensure that they actually left the premises. 2 CP at 759. As a result, they were unhoused for over a year.

*Hilda León and family*

Hilda León lived with four of her grandchildren in an apartment in the same building as her daughter and her daughter's family. A neighbor called the police when they saw one of León's grandchildren—one who lived with her daughter, not León—playing unsupervised. According to León, Rivas told her she was "problematic" and she should be more careful. *Id.* at 813. Rivas said "she would speak with the building's owners so that they would kick [León] out. That if they did not do so, she would come herself to put all of [her] things in the street." *Id.* The landlord gave León a five-day eviction notice because the police had threatened to charge a $1,000 fine. León asked Escalera for help, and she recalls he told her he would look into the situation, but she never heard back from him. Neither Rivas nor Escalera remembers León. León was not able to find other rental housing in Sunnyside for her family. She had to move to Wapato, and she had to separate the grandchildren in her care so they could continue to attend their school in Sunnyside.

*Yesica Santos Nuño and family*

Yesica Santos Nuño lived in a rental house with her five children, her mother, and two nieces. Santos Nuño recalls her landlord making unwanted sexual advances toward her and threatening eviction if she did not have sex with him. She believes

he wrongfully accused her and her son of stealing in retaliation because she rejected him. The landlord called the police to evict the Santos Nuño family, and Rivas, Sparks, and Glossen told Santos Nuño she had two days to leave. Santos Nuño was never charged with a crime. Rivas claims she told the landlord that police cannot evict people, though police reports indicate she followed up to check that the Santos Nuño family had moved out. The family left, "follow[ing] the orders of the Sunnyside Police officers." *Id.* at 782. Santos Nuño could not find anywhere for her family to live together—her children had to split up and stay with other family members, her mother and nieces went to a hotel, and Santos Nuño "lived on the streets" for a time. *Id.* It took a year before she could find housing where she could afford to live with all her children again.

*Marisol Paniagua, Yolanda Paniagua Dimas, and their families*

Yolanda Paniagua Dimas wanted to rent an apartment for her family near her sister, Marisol Paniagua. Paniagua and her children lived in a low-income housing building in Sunnyside. Rivas had advised the building manager not to rent to Paniagua Dimas because there were "red flags" with her family, apparently based on an argument Paniagua Dimas's 17-year-old son had with another family member when visiting Paniagua's apartment. *Id.* at 626. Paniagua Dimas was able to move in with her three younger children but without her 17-year-old son. In fall of 2016, there was a fight between neighbors in the parking lot and Paniagua Dimas was hurt,

9

but no criminal charges were filed against anyone. According to Paniagua and Paniagua Dimas, after the fight, Rivas said both families were evicted and they had to move out in three days. By Rivas's recollection, Paniagua Dimas did not have a lease at her apartment; Rivas claims the landlord wanted her to trespass Paniagua Dimas for assault. According to the sisters, the landlord did not want to evict them but said she could not do anything to help because it was Rivas's decision. They were afraid of Rivas, so they left, "following Officer [Rivas]'s orders." *Id.* at 770.

Paniagua stayed with family, but, at times, she and her son had to sleep in her car; she could not find another apartment until 2017. Paniagua Dimas had nowhere to go. For a month, she stayed in a hotel, though the children had to sleep on the floor or separate and stay with other family. Paniagua Dimas was pregnant at the time, and the stress of housing instability made her pregnancy difficult. And with the expense of the hotel, she struggled to afford school supplies for her children. Paniagua Dimas later moved in with family, where she and her children had to share a single room; she could not find another rental she could afford until 2018. Neither family has been able to get back into low-income housing.

### 3. Expert Reports

The State also offered expert reports regarding police policies and housing discrimination. The respondents have not offered any counter expert opinions.

Chet Epperson is a police practice and policy expert. Epperson noted that the City operated the CFRHP without any official policy for nine years before it adopted a written policy in 2019, in response to the attorney general's office's concerns. Without a policy, he observed, police officers recommended or directed landlords to evict tenants and took it upon themselves to monitor whether tenants were complying. He also opined that the CFRHP trainings were inadequate and there was no method to ensure the police officers' actions comported with their training. Epperson discovered several police incident reports that failed to describe a crime or nuisance that would support a notice of violation of the CFRHP and, rather, that indicated the CFRHP was being enforced against crime victims. In his opinion, the Sunnyside Police Department failed to meet professional policing standards because it operated the CFRHP without an official written policy for years, failed to provide training on how to enforce the CFRHP, and failed to supervise the CFRHP.

Dr. Rebecca Tippett is a sociologist specializing in demography. She reviewed CFRHP enforcement data and compared it against the demographics of the rental housing community of the City. She found there were more incidences of CFRHP enforcement in areas with higher than average concentration of Latinx households by a "large and statistically significant" ratio. *Id.* at 729. She found similar patterns of disparate enforcement in areas with higher than average concentrations of households led by women and households with children. In Dr.

11

Tippett's opinion, the CFRHP was enforced in a way that "disproportionately and significantly" impacted Latinx households, households led by women, and households with children under 18. *Id.* at 755.

B.      Procedural History

The State filed the instant action in Yakima County Superior Court in 2020, invoking the attorney general's authority under RCW 43.10.030(1).[3]   The State named the City, Escalera, Rivas, Sparks, Glossen, and Rivard as defendants for their actions enforcing the CFRHP.   The complaint alleged seven causes of action: (1) denial of procedural due process under color of law, in violation of the United States Constitution[4], (2) denial of substantive due process under color of law, in violation of the United States Constitution, (3) denial of due process under the color of law, in violation of the Washington Constitution, (4) housing discrimination in violation of the Fair Housing Act (FHA)[5], (5) housing discrimination in violation of the Washington Law Against Discrimination (WLAD)[6], (6) evicting residents without a court order, in violation of the RLTA, and (7) evicting residents because they were

---

[3] The State first challenged the City's practices in 2019, in a separate action filed in federal court.   The district court dismissed the case without prejudice under Fed. R. Civ. P. 12(b)(1), finding it lacked subject matter jurisdiction because the State failed to allege sufficient facts for standing in federal court.   The two complaints are similar, but not identical. *Compare* 1 CP at 25-44, *with id.* at 170-86.

[4] *See* 42 U.S.C. § 1983.

[5] 42 U.S.C. § 3604.

[6] Ch. 49.60 RCW.

victims of domestic violence or sexual assault, in violation of the RLTA.  The State requested declaratory relief, injunctive relief, and damages.

1.      In Federal Court: Defendants' First Summary Judgment Motion

The defendants immediately removed the case to federal court and, after some discovery, the defendants moved for summary judgment.

The federal district court granted summary judgment on the basis that the State had not established standing to bring the federal claims.  Citing article III of the United States Constitution, the court recognized that standing is part of the case or controversy requirement limiting the jurisdiction of federal courts; it focused on whether the State had set forth sufficient facts to satisfy the requirements of article III and the additional requirements for parens patriae standing.  1 CP at 301-02 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607, 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982) (*Snapp*)).  The court concluded the State had shown isolated incidents injuring individuals rather than a pattern of enforcement that would be harmful if it were to spread to other parts of Washington or a special interest separate from the interests of individual residents, as required for parens patriae standing.  Accordingly, the court granted summary judgment as to the § 1983 and FHA claims for lack of standing and declined to exercise supplemental jurisdiction over the remaining state law claims.  *Id.* at 317.

13

The court later amended the judgment to remand *all* of the State's claims to state court. *Id.* at 115-16 (citing 28 U.S.C. § 1447(c) (requiring remand of a removed case when the federal court lacks subject matter jurisdiction)).

> 2.     In State Court: Defendants' Second Summary Judgment Motion

Back in Yakima County Superior Court, the defendants moved for summary judgment once again. Their primary theory on this motion was that the State lacked the statutory authority to pursue this matter in any court for the same reasons it lacked standing in federal court. The defendants argued that the analyses for the attorney general's authority to pursue matters of public concern and the parens patriae doctrine are effectively the same and, so, the federal court's standing ruling should have preclusive effect. They also argued the State could not provide admissible evidence demonstrating violations of the law and alleged that three tenant declarations contained hearsay the court should not consider. The defendants also raised a variety of other arguments for dismissal of all the State's claims, including that the individual defendants were entitled to qualified immunity, the City was not subject to liability under the RLTA or for any claims under § 1983, and the State could not establish a prima facie case of housing discrimination or any basis for injunctive relief.

The superior court granted summary judgment to the defendants. The court did not specify the grounds for its decision but did indicate that it considered all of

the declarations of the tenants, the landlord, and the State's experts. 2 CP at 852-53.

The court denied the State's motion for reconsideration.[7]

The State appealed, and we retained the case for hearing and decision.[8]

ANALYSIS

We review summary judgment rulings de novo, "engag[ing] in the same inquiry as the superior court." *Davis v. Baugh Indus. Contractors, Inc.*, 159 Wn.2d 413, 416, 150 P.3d 545 (2007); *Lakehaven Water & Sewer Dist. v. City of Federal Way*, 195 Wn.2d 742, 752, 466 P.3d 213 (2020). Summary judgment is appropriate only when there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The court must consider the facts submitted "in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013). "The motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion." *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993).[9]

---

[7] As discussed *infra*, we reverse the order granting summary judgment. We therefore do not reach the denial of reconsideration.

[8] Briefs of amici curiae have been filed by the Fair Housing Center of Washington and Fred T. Korematsu Center for Law and Equality, Northwest Justice Project, and the American Civil Liberties Union of Washington.

[9] The respondents argue as a threshold matter that some of the tenant declarations should be excluded from consideration as hearsay or double hearsay. *See* CR 56(e) (affidavits and declarations in support of summary judgment must set forth facts as would be admissible in evidence); ER 802. However, out-of-court statements may be admissible if they satisfy a hearsay exception or if offered for a purpose other than the truth of the matter asserted. ER 803(a); ER

I.	Attorney General Authority under RCW 43.10.030(1)

The primary issue before us is whether the attorney general is authorized to bring this case at all. The scope of the attorney general's authority involves questions of statutory interpretation and constitutional law, which we review de novo. *Lakehaven Water & Sewer Dist.*, 195 Wn.2d at 752.

The attorney general is an executive officer created by the state constitution who "shall be the legal adviser of the state officers, and shall perform such other duties as may be prescribed by law." WASH. CONST. art. III, § 21. The Washington Legislature has provided that the attorney general shall "[a]ppear for and represent the state before the supreme court or the court of appeals in all cases in which the state is interested." RCW 43.10.030(1). We have held that RCW 43.10.030(1) "confers broader authority than the plain text indicates." *City of Seattle v. McKenna*, 172 Wn.2d 551, 560, 259 P.3d 1087 (2011).

---

801(d). The respondents concede that statements attributed to the individual officers could be admissible as statements of party opponents. Wash. Sup. Ct. oral arg., *State v. Sunnyside et al.*, No. 101205-5 (June 15, 2023), at 31 min., 39 sec. to 32 min., 25 sec., *audio recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2023061145&startStreamAt=1899 &stopStreamAt=1945; *see* ER 801(d)(2); *Momah v. Bharti*, 144 Wn. App. 731, 750, 182 P.3d 455 (2008). On remand, the trial court will consider any admissibility challenges when the evidence is offered for particular purposes. On review of the summary judgment order, though, we must engage the same inquiry as the superior court and consider "all the evidence." *Clements*, 121 Wn.2d at 249. Therefore, we consider the entire summary judgment record, as did the superior court. 2 CP at 852-53.

A.      Matters of Public Concern

This court has considered the scope of the attorney general's authority under RCW 43.10.030(1) in *City of Seattle*, 172 Wn.2d 551, *Young Americans for Freedom v. Gorton*, 91 Wn.2d 204, 588 P.2d 195 (1978) (*YAF*), and *State v. Taylor*, 58 Wn.2d 252, 362 P.2d 247 (1961), finding the actions were authorized in each case.  Under those cases, the attorney general has discretionary authority to act in any court in matters of public concern, even without express statutory authorization, provided there is a cognizable common law or statutory cause of action.  *City of Seattle*, 172 Wn.2d at 562 (quoting *Taylor*, 58 Wn.2d at 256-57); *YAF*, 91 Wn.2d at 209.

First, in *Taylor*, the attorney general brought an action for accounting against a charitable trust.  58 Wn.2d at 254.  We concluded the attorney general had a duty to represent the public interest in enforcing a charitable trust and could maintain an action against the trustees concerning its administration.  *Id.* at 255, 261.  We noted that the attorney general was particularly suited to enforce the duties of the trustees because it was "unlikely that any person or group of persons would be directly interested or sufficiently affected to be accorded legal standing or status, such as in the case of beneficiaries of a private trust, to investigate and to do something about mismanagement."  *Id.* at 259, 256 ("'A charitable trust is of public concern and the attorney-general is the protector of the interests of the public, or, what is the same

17

thing, of the indefinite and fluctuating body of persons who are the cestui que trust.'" (internal quotation marks omitted) (quoting *Samuel & Jessie Kenney Presbyterian Home v. State*, 174 Wash. 19, 40, 24 P.2d 403 (1933))). Therefore, the attorney general could maintain an action against the trustees of a charitable trust "as representative of the public and particularly of those individuals who may be specially benefited," provided there is a "cognizable common law or statutory cause of action." *Id.* at 261, 257.

Next, in *YAF*, we held that the attorney general was authorized to file an amicus brief on behalf of the State and the University of Washington in an affirmative action case before the United States Supreme Court, *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978). 91 Wn.2d at 212. We held that the attorney general has "broad and inclusive" authority to act in cases "which may directly or indirectly impact upon state functions or administrative procedures and operations." *Id.* at 207. The court reasoned that the concern of the State in higher education and, particularly, the University of Washington's minority admissions programs, "was sufficiently vital" for the attorney general to act. *Id.* We also concluded the State had a sufficient public interest in the outcome of the *Bakke* litigation because the decision could affect whether and how state universities and colleges could consider race in order to increase enrollment of students from underrepresented communities. *Id.* at 212.

Most recently, in *City of Seattle*, we held that the attorney general had the authority to make the State a party to a multistate federal action challenging the constitutionality of a health care reform act. 172 Wn.2d at 553-54. We held that health care reform "is unquestionably a matter of public concern in which the State has an interest" because the act's provisions directly affect residents by expanding access to Medicaid and imposing a penalty for persons without minimum insurance coverage. *Id.* at 562-63.

The respondents contend these cases stand for the proposition that RCW 43.10.030(1) requires a showing "that the *number* of people affected by the alleged unlawful conduct must be significant enough to demonstrate that the interest of the public and State is more than nominal and that the State has a quasi-sovereign interest in the matter"—"the equivalent of the standard for *parens patriae* standing." Resp't City's Resp. Br. (Resp'ts' Br.) at 50 (emphasis added). They are incorrect. That interpretation requires a forced overreading of our caselaw and ignores the roots of these doctrines, and it should be rejected.

Nowhere in these cases has this court stated there is a numerical requirement of Washingtonians to be affected before the attorney general may exercise their authority. To the contrary, *Taylor* specifically contemplated that the attorney general would be best suited to bring an action when there is *not* a significant number of people directly affected by the unlawful conduct. 58 Wn.2d at 259. There, the

19

attorney general was authorized to bring the kind of action at issue, in part, *because* it was unlikely that any person or group of persons would be sufficiently affected to bring an action to enforce the trustee duties of a charitable trust. *Id.* Moreover, while it may be true as a descriptive matter that many students attend the schools affected by an affirmative action decision and many people use health insurance, neither *YAF* nor *City of Seattle* treated those facts as necessary or even sufficient. Instead, they focused on the nature of the public interest affected—the ability to increase the enrollment of students from underrepresented communities, access to Medicaid, and potential penalties for people without health insurance. *YAF*, 91 Wn.2d at 212; *City of Seattle*, 172 Wn.2d at 562-63. The fact that those effects may be felt statewide may be relevant, but the driving consideration was *how* those matters would impact the state. Thus, this "matter of public concern" analysis is better characterized as looking to whether the matter has a *significant effect* on Washingtonians rather than whether it affects a *significant number* of Washingtonians. *See YAF*, 91 Wn.2d at 207 ("cases which may directly or indirectly impact upon state functions"); *City of Seattle*, 172 Wn.2d at 562 ("directly affect residents of the state").

The respondents argue on this theory that the attorney general is not authorized to seek to enforce the private rights of a small number of individuals. But that is not the gravamen of the State's complaint. Rather, the State has an interest in

protecting the health, safety, and well-being of its residents, including holding government actors accountable against allegations of discrimination and violations of constitutional rights. The State is not seeking to simply enforce individual rights—tenants have no rights to appeal a notice of violation under the CFRHP. Rather, the State's claims implicate three categories of interests that qualify as matters of public concern: the lawful operation of crime-free rental housing programs, protecting the civil rights of Washingtonians, and preventing police misconduct. All of those issues have significant effects on Washingtonians.

The lawful operation of crime-free rental housing programs undoubtedly has a significant effect on residents of this state. Though we have never required express statutory authorization for the attorney general to maintain a particular action under RCW 43.10.030(1), *see YAF*, 91 Wn.2d at 209 (citing *Taylor* 58 Wn.2d at 256), the public import of these matters is evidenced in our statutes.[10] In permitting crime-

---

[10] The respondents' statement of additional authorities identifies a bill that would add new sections to chapter 43.10 RCW, authorizing the attorney general to "investigate and bring an action against a law enforcement agency or local corrections agency . . . for a violation of the Washington state Constitution or state law" "[a]s a matter of state interest and public concern under RCW 43.10.030(1)." SECOND SUBSTITUTE H.B. 1445, § 3, 68th Leg., Reg. Sess. (Wash. 2023). The bill includes a new section stating, "It is the intent of the legislature to clarify existing authority" of the attorney general. *Id.* § 1. The respondents argue this bill supports their position that this kind of action is *not* authorized under the current statute because the legislature would not need to codify this authority if RCW 43.10.030(1) *already* permitted it. This potential legislation should not bear on our analysis. Even if enacted as written, the text of the bill states that it is intended to "clarify *existing* authority" of the attorney general. *Id.* (emphasis added). Moreover, the significance of this bill on this case is dubious, as it is far from becoming law. The bill was not passed in 2023 and, although it was reintroduced in the 2024 regular legislative session, it did not receive a committee hearing. We cannot yet know if the legislature will ever pass this bill, nor should we

free rental housing programs, the legislature found that the cooperation of local governments, landlords, and tenants to reduce crime in rental housing "is beneficial to the public health, safety, and welfare." RCW 35.106.005. It also expressed concern about programs that effectively bar people from accessing rental housing and therefore provided requirements that local governments must follow to prevent abuse of such programs, such as voluntary participation unless the local government has given the landlord notice with specific information about criminal activity occurring at the residence. *Id.*; RCW 35.106.020(2)-(4). Thus, the fair and lawful enforcement of crime-free rental housing programs is a matter of public concern affecting Washingtonians' ability to access rental housing.

The legislature has also indicated that discrimination in housing is a matter of public concern. In enacting the WLAD, the legislature declared

> that practices of discrimination against any of its inhabitants because of race, creed, color, national origin, citizenship or immigration status, families with children, sex, [or] marital status . . . *are a matter of state concern*, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state.

RCW 49.60.010 (emphasis added). Both the WLAD and the FHA prohibit discrimination in rental housing on the basis of race, ethnicity, sex, and familial status. RCW 49.60.222; 42 U.S.C. § 3604(b). Here, the State brought suit

---

base our analysis on speculation of what the final language may be. *Lowe's Home Ctrs., LLC v. Dep't of Revenue*, 195 Wn.2d 27, 41 n.5, 455 P.3d 659 (2020).

22

challenging the enforcement of the CFRHP on the basis that it violates state and federal antidiscrimination laws by disparately impacting Latinx renters, households led by women, and families with children. The State has also produced evidence that the enforcement of the CFRHP is forcing City residents to separate their families and experience homelessness—which are profoundly traumatic experiences. *See* KAYA LURIE & BREANNE SCHUSTER, SEATTLE UNIV. HOMELESS RTS. ADVOC. PROJECT, DISCRIMINATION AT THE MARGINS: THE INTERSECTIONALITY OF HOMELESSNESS & OTHER MARGINALIZED GROUPS 17, 33 (Sara K. Rankin ed. 2015).[11]

The City's CFRHP does not exist in a vacuum devoid of historical or demographic context. Rather, the allegations that the CFRHP has been enforced in a way that deprives residents of the protections owed under the law and disparately impacts protected classes resonate in the halls of history, where present-day disparities in home ownership and racially segregated neighborhoods can be traced to redlining, discriminatory restrictive covenants, race-based zoning laws, and nuisance laws that criminalize race, gender, and poverty.[12] In the City rental

---

[11] https://digitalcommons.law.seattleu.edu/cgi/viewcontent.cgi?article=1002&context=hrap [https://perma.cc/HUN3-ETYB]

[12] *See generally* RICHARD ROTHSTEIN, THE COLOR OF LAW: A FORGOTTEN HISTORY OF HOW OUR GOVERNMENT SEGREGATED AMERICA (2017) (describing the origins and modern effects of redlining); *see also In re That Portion of Lots 1 & 2*, 199 Wn.2d 389, 395-96, 506 P.3d 1230 (2022) (describing the history of racially restrictive covenants); George Lipsitz, *"In an Avalanche Every Snowflake Pleads Not Guilty": The Collateral Consequences of Mass Incarceration and*

community, Latinx households represent around three-quarters of renter households, households led by single women represent nearly half of renter households, and children are present in more than half of renter households—and the State's expert found evidence that the CFRHP has been enforced disproportionately and significantly against each of those communities.  2 CP at 755.

It seems tautological to state that matters of civil rights like due process and protection against discrimination are matters of public concern that significantly affect residents of Washington.  *City of Seattle*, 172 Wn.2d at 562-63 (holding that health care reform is "unquestionably" a matter of public concern); *State ex rel. Dunbar v. State Bd. of Equalization*, 140 Wash. 433, 440, 249 P. 996 (1926) (the attorney general's "paramount duty is made the protection of the interest of the people of the state" and they have a duty to act on "violations of the constitution or the statutes by a state officer" to protect the interests of the public). Addressing injustice and racial bias in our institutions is a collective endeavor.   Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. at 1 (June 4, 2020) ("The injustice still plaguing our country has its roots in the individual and collective actions of many, and *it cannot be addressed without the individual and collective actions of us all*." (emphasis added)),

---

*Impediments to Women's Fair Housing Rights*, 59 UCLA L. REV. 1746, 1753-66, 1780-95 (2012) (describing how poverty, housing discrimination, and incarceration intersect to undermine the welfare and dignity of Black women and Latinas).

24

https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Ju

diciary%20Legal%20Community%20SIGNED%20060420.pdf

[https://perma.cc/QNT4-H5P7].[13]

If crime-free rental ordinances are being operated in ways that violate due process and antidiscrimination laws, this has significant effects on Washingtonians, and holding police and local governments accountable is "unquestionably" a matter of public concern in which the State has an interest. *City of Seattle*, 172 Wn.2d at 562. Sunnyside is not the only city to operate programs such as this, and the attorney general should intervene, as it has done here, before similar enforcement problems arise throughout the state. *See* Br. of Amicus Curiae Am. C.L. Union of Wash. in Supp. of Appellant State of Wash. at 12-14 (sampling found at least 17 cities in Washington with CFRHPs, and CFRHPs are more common in communities of color than in white communities). We reject the respondents' arguments that we should adopt a parens patriae approach to elucidate the RCW's "matters of public concern" language; such an analysis is inapplicable in this context. We have never used such an approach in our precedent analyzing the attorney general's authority and we

---

[13] Contrary to the concurring opinion, we make no comment on the CFRHP itself based on our "social beliefs." Concurrence (Madsen, J.) at 3. The allegations of the problems with its enforcement have undeniable context. Claims of discriminatory enforcement, in particular, cannot be understood without recognizing the many forms of housing discrimination that necessitated the enactment of laws like the WLAD and the FHA. The fact that our institutions of law have made such practices unlawful does nothing to diminish their significance as matters of public concern. If anything, it proves the point on which this court unanimously agrees: that the allegations in this case involve matters of public concern for which the attorney general is authorized to bring suit.

decline to do so now.  Instead, we look to the nature and significance of the impact

on our state and its people, consistent with *Taylor*, *YAF*, and *City of Seattle*.  Properly

evaluated under that test, this action constitutes a matter of public concern and the

attorney general is authorized to maintain this action on behalf of the State under

RCW 43.10.030(1).

B.     Issue Preclusion

Related to their arguments about the attorney general's authority to bring this

action, the respondents ask us to give preclusive effect to the federal district court

summary judgment order, based on its discussion of quasi-sovereign interests.  As

stated, the attorney general's authority under Washington statutes is not equivalent

to the limits of article III standing.  Thus, a prior order dismissing a case for lack of

standing in an article III court and remanding to state court cannot have preclusive

effect on this issue of statutory interpretation.

Issue preclusion, or collateral estoppel, prevents relitigation of issues the

parties have had a full and fair opportunity to present. *Barr v. Day*, 124 Wn.2d 318,

324-25, 879 P.2d 912 (1994).  This doctrine prevents a party from relitigating an

issue if four requirements are met: (1) the current issue is identical to the issue

decided in a prior adjudication, (2) the prior adjudication ended in a final judgment

on the merits, (3) the party seeking to advance the current issue was a party (or in

privity with a party) in the prior adjudication, and (4) barring relitigation of the issue

would not work an injustice. *Hanson v. City of Snohomish*, 121 Wn.2d 552, 562, 852 P.2d 295 (1993). The party asserting issue preclusion has the burden to establish each of these requirements. *Luisi Truck Lines, Inc. v. Wash. Utils. & Transp. Comm'n*, 72 Wn.2d 887, 894, 435 P.3d 654 (1967).

The respondents cannot show that the issues are identical as those in the federal court proceeding. As explained, the federal district court's ruling and the Yakima County Superior Court's ruling involved distinct issues, so the respondents cannot satisfy the identical issue requirement. The federal district court's ruling is, on its face, a ruling on standing, which relates to the federal court's subject matter jurisdiction. 1 CP at 317 (granting summary judgment "on the basis of lack of standing"), 115-16 (remanding as required under 28 U.S.C. § 1447(c) when a federal district court lacks subject matter jurisdiction over a removed case). The court's analysis turned on the elements of article III standing under *Lujan* and the additional elements for parens patriae standing under *Snapp*. These doctrines apply to the subject matter jurisdiction of federal courts and are not part of our analysis of the Washington attorney general's statutory authority to maintain actions in matters of public concern. The respondents cannot assert issue preclusion here where the issues are not identical. *Hanson*, 121 Wn.2d at 562.[14] Issue preclusion does not apply here.

---

[14] Moreover, as explained above, this case involves matters of public concern. Applying collateral estoppel here would work an injustice as it would prevent the attorney general from pursuing these matters of public concern that were dismissed from federal court for reasons

The respondents are not entitled to summary judgment on the basis that the attorney general lacks authority to maintain this action under either their theory of statutory interpretation or issue preclusion. We reverse.

II.     Qualified Immunity

The individual respondents also argue they are entitled to qualified immunity for the claim that alleges violations of procedural due process under the United States Constitution and therefore summary judgment is proper at least as to the individual respondents.[15] We disagree that summary judgment should be granted on this basis, given the genuine disputes of material fact about whether the City's police officers forced tenants to leave their homes through extrajudicial evictions in violation of clearly established law.

Section 1983 provides an avenue to redress injuries by the actions of the government that violate the constitution or federal law. 42 U.S.C. § 1983.[16] Under

---

entirely aside from their merits. *Hanson*, 121 Wn.2d at 562. The attorney general has not only the authority but the duty to bring cases on behalf of the State in matters of public concern in which the State is interested, RCW 43.10.030(1), and giving the federal court's order preclusive effect here would work an injustice.

[15] Qualified immunity may be available for individual respondents for the § 1983 claims, but is not applicable to the claims for declaratory or injunctive relief or for any § 1983 claims against the City. *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980).

[16] See Theodore Eisenberg, *Section 1983: Doctrinal Foundations and an Empirical Study*, 67 CORNELL L. REV. 482, 484-86 (1982), and Katherine A. Macfarlane, *Accelerated Civil Rights Settlements in the Shadow of Section 1983*, 2018 UTAH L. REV. 639, 660-63, for a discussion of the historical origins and evolution of § 1983, which was enacted as part of the Ku Klux Act of 1871 in response to states' failure to enforce the law against violent backlash by the Ku Klux Klan and other powerful government actors who opposed Reconstruction.

§ 1983, a person may recover damages if, under color of law, they are deprived of a federal right. *Id.*; *Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 11, 829 P.2d 765 (1992), *abrogated on other grounds by Chong Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019). But the judicially created doctrine of qualified immunity protects government officials from liability for civil damages under § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Qualified immunity balances protecting public officials from "harassment, distraction, and liability when they perform their duties reasonably" with "the need to hold public officials accountable when they exercise power irresponsibly." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

Courts determine whether a government official is entitled to qualified immunity by considering (1) whether the facts make out a violation of a constitutional right and (2) whether the right was "clearly established" at the time of the alleged misconduct. *Id.* at 232. Courts may consider the two prongs in any order. *Id.* at 236. The test is an objective one. *Id.* at 244; *Staats v. Brown*, 139 Wn.2d 757, 772, 991 P.2d 615 (2000); *Harlow*, 457 U.S. at 819.

Respondents argue their actions did not violate a clearly established constitutional right. However, the due process right to notice and an opportunity to

be heard prior to eviction has been clearly established, and there are genuine disputes

of material fact as to whether the respondents' actions violated due process.

Respondents have not shown they are entitled to summary judgment on this basis.

Qualified immunity will not attach when "[t]he contours of the right [are]

sufficiently clear that a reasonable official would understand that what [they are]

doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct.

3034, 97 L. Ed. 2d 523 (1987).  A right may be "'clearly established' even absent a

specific holding on the particular question at issue." *Staats*, 139 Wn.2d at 772.

Qualified immunity does not require that a court has previously held the same

conduct unconstitutional—rather, "'in the light of pre-existing law the unlawfulness

must be apparent.'" *Jones v. State*, 170 Wn.2d 338, 355, 242 P.3d 825 (2010)

(quoting *Anderson*, 483 U.S. at 640).

Here, the State argues any reasonable police officer would know due process

protects a tenant's property interest in their rented home.  Appellant State of Wash.'s

Br. at 52-53 (quoting *Greene v. Lindsey*, 456 U.S. 444, 450-51, 102 S. Ct. 1874, 72

L. Ed. 2d 249 (1982)).  In *Greene*, the United States Supreme Court held that a

sheriff's department's practice of service of process in forcible entry and detainer

actions by placing notices on apartment doors fell short of the "minimum standards

of due process."  456 U.S. at 453.  The Court observed that evicted tenants had "been

deprived of a significant interest in property: indeed, of the right to continued

residence in their homes," and it recognized that the basic principles of due process first require notice and an opportunity to be heard. *Id.* at 451. Since the notice was not "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections,'" the State deprived the tenants of property without due process of law, in violation of the Fourteenth Amendment. *Id.* at 449-50 (emphasis omitted) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950)), 456.

Washington cases have also addressed the due process requirements related to ending a tenant's right to continued possession of a rental home. In *Carlstrom v. Hanline*, the Court of Appeals held that summary proceedings like unlawful detainer actions satisfy the requirements of procedural due process because they provide opportunity for complaint and answer and a hearing before a judge. 98 Wn. App. 780, 789-90, 990 P.2d 986 (2000). Similarly, in *Leda v. Whisnand*, the court held that in such proceedings, a tenant must be permitted to present a written or oral defense because due process requires "at a minimum," that they "be afforded 'a meaningful opportunity to be heard.'" 150 Wn. App. 69, 83, 207 P.3d 468 (2009) (quoting *Carlstrom*, 98 Wn. App. at 790). The court explained, "Washington law simply does not countenance eviction of people from their homes without first affording them some opportunity to present evidence in their defense." *Id.*

31

Additionally, federal courts have considered it clearly established that police officers cannot force people from their rental homes without due process. The Ninth Circuit of the Court of Appeals recently denied qualified immunity in similar circumstances where a police officer ordered a tenant to leave his leased home without notice or process. *Clark v. Davis*, 772 Fed. Appx. 603, 604 (9th Cir. 2019) (citing *Greene*, 456 U.S. at 456; *Fuentes v. Shevin*, 407 U.S. 67, 87, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972)); *see Prison Legal News v. Lehman*, 397 F.3d 692, 701-02 (9th Cir. 2005) (we may look to unpublished decisions and decisions of other jurisdictions to determine whether a right is "clearly established"). In *Thomas v. Cohen*, the Sixth Circuit denied qualified immunity to police officers who told tenants they had to leave their apartments immediately without a court order of eviction. 304 F.3d 563, 576-77 (6th Cir. 2002). The court held that it was clearly established "that tenants are generally 'entitled to pre-eviction judicial oversight in the absence of emergency circumstances'" and that the officers' actions constituted nonjudicial evictions in violation of due process. *Id.* at 577 (quoting *Flatford v. City of Monroe*, 17 F.3d 162, 170 (6th Cir. 1994)); *see also Bridgeforth v. Bronson*, 584 F. Supp. 2d 108, 120 (D.D.C. 2008) (denying qualified immunity to a police officer "who reasonably should have known that it is unlawful for police officers to evict a tenant without a court order").

Police removing or otherwise evicting tenants from their homes without the notice and opportunity to be heard provided by an eviction order and judicial proceedings violates due process. The doctrine of qualified immunity requires that a right be clearly established, meaning that the unlawfulness of the conduct is "apparent," in light of preexisting law, not that there must be a prior case precisely addressing the exact same conduct. *Anderson*, 483 U.S. at 640. Washington and federal courts have clearly established that tenants are entitled to notice and an opportunity to be heard prior to eviction and that police may not extrajudicially evict tenants. And here, each of the individual police officer respondents have stated that they understand they have no authority to evict tenants. Thus, the contours of the right are sufficiently clear and a reasonable officer would understand the alleged misconduct violates that right. *Id.*

The respondents also argue that none of these cases control because they dispute that any of the tenants the State has identified here were actually evicted. Again, at summary judgment, we view the facts in the light most favorable to the State as the nonmoving party, *Clements*, 121 Wn.2d at 249, and there are genuine disputes of material fact as to whether tenants were forced to leave their homes at the direction of police and by which police officers. The individual police officers deny they evicted anyone, ordered landlords to evict tenants, or ordered tenants to leave their homes. In contrast, numerous tenants contend Rivas told them to leave

their apartments or told their landlords to evict them, and they understood they were evicted at the direction of the police. *See* 2 CP at 790-91 (Vargas), 799 (Chagolla), 759 (Heather Francis), 764 (Rodney Francis), 813 (León), 782 (Santos Nuño), 769 (Paniagua Dimas), 775 (Paniagua); *see also id.* at 462 (police report stating Rivas requested the landlord evict residents), 662 (same). These are genuine issues of material fact that need further analysis at the trial court.

The other individual respondents also argue that none of them participated in any conduct that allegedly violated the federal constitution. The tenants' declarations provide a contrary picture as to those respondents as well. For example, the Francises claim their landlord evicted them because Rivard and Rivas threatened her with a $1,000 fine if she did not. Guizar claims Rivard told her to move out of her house in three days. Santos Nuño claims Sparks, Glossen, and Rivas told her she had two days to leave her home. Taken in the light most favorable to the State, these accounts of the respondents' actions would support the State's claim that they improperly enforced the CFRHP by directing evictions without proper notice and process. Additionally, Chagolla recalls that Escalera said Rivas was in charge of the CFRHP and he could not do anything about it, which could support the State's claim that Escalera failed to supervise Rivas and the enforcement of the CFRHP. This evidence is sufficient at least to create genuine disputes of material fact as to whether

the individual respondents engaged in unlawful conduct in violation of a clearly established right.

Respondents are not entitled to summary judgment on the basis of qualified immunity. "Denial of qualified immunity is not a finding of liability, but simply a delegation of that question to the trier of fact." *Staats*, 139 Wn.2d at 772. On this record, there are genuine disputes of material fact and the respondents are not entitled to qualified immunity as a matter of law.

III.    Municipal Liability

A municipality may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). To hold a city liable under *Monell*, a plaintiff must establish "(1) that [they] possessed a constitutional right of which [they were] deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389-91, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).

With little argument, the respondents claim the City is not liable under *Monell* because the State has not established deliberate indifference by the City in its failure to train and supervise police. The State argues the City is liable because it failed to maintain meaningful guidance, training, or supervision to those enforcing the CFRHP. A local government may be liable for inadequate training if it "reflects a 'deliberate' or 'conscious' choice." *Harris*, 489 U.S. at 389 (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985) (plurality portion)). Here, it is undisputed that the Sunnyside Police Department had a policy that placed one officer—Rivas—in charge of enforcing the CFRHP and that other officers referred CFRHP matters to her. It is also undisputed that the police department offered CFRHP trainings to officers only twice— in 2011 and 2019— and Rivas and Sparks are the only respondents who participated in those trainings. As the respondents have not offered any evidence to the contrary, it is reasonable to infer that the City chose to structure the training and supervision of the CFRHP this way. *Clements*, 121 Wn.2d at 249.

The respondents also claim the State has not established there is an underlying constitutional violation or that the City's policies are the moving force behind it. As discussed above, there are genuine disputes of material fact as to whether the respondents violated due process. The "moving force" element is a test of causation—the plaintiff must prove the City's policies "actually caused" the

indifference to constitutional rights. *Harris*, 489 U.S. at 391. Again, undisputed evidence supports this causal connection. The unrebutted police expert report concluded inadequate training and supervision and the lack of official written policy allowed the respondents to operate the CFRHP improperly and to improperly direct evictions.

Taken in the light most favorable to the State, the evidence thus far precludes summary judgment for the City on the basis of *Monell* liability.

IV.   Availability of Injunctive Relief

The respondents also argue they are entitled to summary judgment because injunctive relief is not available for the state constitutional claims. Injunctive relief may be granted if there is (1) a "'clear legal or equitable right,'" (2) "'a well-grounded fear of immediate invasion of that right,'" and (3) "'the acts complained of are either resulting in or will result in actual and substantial injury.'" *Tyler Pipe Indus., Inc. v. Dep't of Revenue*, 96 Wn.2d 785, 792, 638 P.2d 1213 (1982) (quoting *Port of Seattle v. Int'l Longshoremen's & Warehousemen's Union*, 52 Wn.2d 317, 319, 324 P.2d 1099 (1958)).

The respondents argue the State can have no well-grounded fear of immediate invasion of any right because the City has ceased enforcement of the CFRHP "unless and until this litigation is resolved in its favor." Resp'ts' Br. at 78. But as the State explains, "Voluntary cessation of allegedly illegal conduct does not moot a case

37

because there is still a likelihood of the illegal conduct recurring." *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 82 Wn.2d 265, 272, 510 P.2d 233 (1973); *see Braam v. State*, 150 Wn.2d 689, 709, 81 P.3d 851 (2003) (a plaintiff may pursue injunctive relief unless it is "absolutely clear that behavior will not reoccur"). The record and the respondents' argument demonstrate that they would continue to enforce the CFRHP in the same manner if not for this litigation and that they intend to resume enforcement when this litigation is resolved. *See* 1 CP at 151. If the respondents' actions violate due process, the State has established that it has reason to believe that injury will recur. The respondents have not shown they are entitled to summary judgment on this basis.

V.    Housing Discrimination

The respondents also sought summary judgment on the housing discrimination claims, arguing the State cannot establish a prima facie case of disparate impact because they have not demonstrated an adequate causal connection.[17] The State brought claims under both the WLAD and the FHA and

---

[17] Below, the respondents also argued Dr. Tippett's expert report should not be admitted because her reliance on 2010 census data and broad consideration of CFRHP enforcement "incidents" made her opinion unreliable and irrelevant. 1 CP at 368-69. The State defended the reliability of Dr. Tippett's information sources and countered that the respondents' arguments largely go to the weight a fact finder should accord to the expert opinion rather than its admissibility. In their briefing before this court, the respondents claim they "articulated the deficiencies regarding those opinions and the trial court correctly agreed." Resp'ts' Br. at 74. They included no argument or citation to authority in support and, as discussed *supra* note 9, the trial court did not exclude the report. 2 CP at 852; *see* RAP 10.3(a)(6) (briefs should contain argument with citations to legal authority). We therefore decline to address any admissibility

both prohibit discrimination in rental housing on the basis of race, color, sex, or familial status (including households with children under 18). 42 U.S.C. §§ 3604(a), 3602(k); RCW 49.60.222(f), .040(13). We conclude that there exist genuine issues of material fact on this issue.

Both state and federal law recognize causes of action for disparate impact, which are analyzed under a burden-shifting framework—first, the plaintiff must set out a prima facie case of discrimination, and second, the defendant may rebut by showing some necessity. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 527, 135 S. Ct. 2507, 192 L. Ed. 2d 514 (2015); *Oliver v. Pac. Nw. Bell Tel. Co.*, 106 Wn.2d 675, 679, 724 P.2d 1003 (1986). Third, if the defendant makes that showing, the burden shifts back to the plaintiff to prove there is an alternative practice available that has a less disparate impact. *Inclusive Cmtys.*, 576 U.S. at 533. Here, since the respondents argue only that the State cannot make out a prima facie case, and the State has not moved for summary judgment regarding necessity, we need address only the first step.

The elements of a prima facie disparate impact claim under state and federal law are similar, but not identical. For an FHA disparate impact claim, the plaintiff must show (1) there is an "'outwardly neutral'" policy or practice, (2) "'significantly

---

issues here and, instead, we consider all the evidence in the record at summary judgment, as did the superior court.

adverse or disproportionate impact'" on a protected class, and (3) "'robust causality'" between the policy and alleged disparities. *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 961 (9th Cir. 2021) (quoting *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 711 (9th Cir. 2009); *Inclusive Cmtys.*, 576 U.S. at 542). For a disparate impact claim under the WLAD, the plaintiff must prove (1) there is a facially neutral policy or practice and (2) the policy "falls more harshly on a protected class." *Kumar v. Gate Gourmet, Inc.*, 180 Wn.2d 481, 503, 325 P.3d 193 (2014) (citing *Oliver*, 106 Wn.2d at 679). Statistical analysis may be used under both standards. *Sw. Fair Hous. Council*, 17 F.4th at 961; *Oliver*, 106 Wn.2d at 682.

The respondents primarily argue that Dr. Tippett's report does not demonstrate "robust causality." They argue the prima facie elements for the disparate impact housing discrimination claims under state and federal law—including the "robust causality" requirement—are the same, relying on *Tafoya v. Human Rts. Comm'n*, 177 Wn. App. 216, 311 P.3d 70 (2013).

*Tafoya* did not so hold, and we reject the invitation to conflate the two standards. First, *Tafoya* did not involve a disparate impact claim at all—there, a tenant filed a complaint under the WLAD when her landlord sexually harassed her. 177 Wn. App. at 221. Since Washington law had not previously addressed sexual harassment as an unfair practice in real estate transactions under the WLAD, the

40

court looked to federal case law for some guidance. *Id.* at 224 ("When interpreting Washington law, we may look to the federal case law when a federal anti-discrimination law contains the same protections and mandates the same broad construction."). The *Tafoya* court consulted federal cases to the extent it found housing discrimination laws contemplate broad protections against discrimination in the terms, conditions, or privileges of renting property, not limited to the transaction of entering into a lease agreement. *Id.* at 225. That case did not adopt the "robust causality" approach.

We have never required "robust causality" under the WLAD, and we decline to import that language into a WLAD analysis. Instead, we have described the causation component of WLAD claims as a requirement that the plaintiff show the protected class was a "substantial factor." *See Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 310, 898 P.2d 284 (1995); *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 442, 334 P.3d 541 (2014); *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 412, 430 P.3d 229 (2018); *see also Fell v. Spokane Transit Auth.*, 128 Wn.2d 618, 642 n.30, 911 P.2d 1319 (1996) (equating the test to proximate cause). The WLAD demands liberal construction in order to effectuate its purposes of preventing and eliminating discrimination. RCW 49.60.020, .010; *Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160*, 151 Wn.2d 203, 214, 87 P.3d 757 (2004). "Further, we have held that a statutory mandate of liberal construction

requires that we view with caution any construction that would narrow the coverage of the law." *Marquis v. City of Spokane*, 130 Wn.2d 97, 108, 922 P.2d 43 (1996) (citing *Shoreline Cmty. Coll. Dist. No. 7 v. Emp't Sec. Dep't*, 120 Wn.2d 394, 406, 842 P.2d 938 (1992)). To the extent the WLAD differs from federal antidiscrimination statutes, this court "has almost always ruled that the WLAD provides greater . . . [antidiscrimination] protections than its federal counterparts." *Kumar*, 180 Wn.2d at 491 & n.14 (collecting cases).

Under either the WLAD or the FHA standard, viewing the facts in the light most favorable to the State, the evidence creates genuine issues of material fact that the respondents' enforcement of the CFRHP had a disparate impact on households that are Latinx, headed by women, and include children, and that the protected classes may have been a substantial factor in such enforcement. Here, the unrebutted expert report found that the CFRHP was enforced in a way that "disproportionately and significantly" impacted Latinx households, women-headed households, and households with children under 18. 2 CP at 755. Police reports also show that enforcement of the CFRHP was highly discretionary, with Rivas sometimes initiating CFRHP contact while on patrol and sometimes giving warnings before issuing notices of violation, whereas the tenant declarations describe being evicted with little to no warning. *See, e.g., id.* at 462, 602, 661-62, 666. The question of whether a protected class "was a substantial factor in the alleged discrimination, like

other matters of proximate causation, is a question of fact." *Fell*, 128 Wn.2d at 641;

*Strauss v. Premera Blue Cross*, 194 Wn.2d 296, 301, 449 P.3d 640 (2019)

("Generally speaking, expert opinion on an ultimate question of fact is sufficient to

establish a triable issue and defeat summary judgment.").

There are genuine disputes of material fact that preclude judgment as a matter

of law for the State's claims under both the WLAD and the FHA. We reverse the

grant of summary judgment on this issue and remand to the trial court.

VI.    RLTA

Last, the State raised two claims based on the RLTA. It argues the

respondents violated the RLTA by evicting tenants without a judicial eviction order

and by evicting tenants because they were victims of domestic violence. RCW

59.18.290, .580(2). The respondents argue they cannot be held liable under the

RLTA because they are not landlords. Based on the limited record before us, we

conclude that the respondents are correct.

We give effect to the plain meaning of a statute when it is apparent from the

language of the statute and related statutes. *Dep't of Ecology v. Campbell & Gwinn,*

*LLC*, 146 Wn.2d 1, 11-12, 43 P.3d 4 (2002). The RLTA regulates the

landlord/tenant relationship. *Silver v. Rudeen Mgmt. Co.*, 197 Wn.2d 535, 538, 484

P.3d 1251 (2021). A landlord is "the owner, lessor, or sublessor of the dwelling

unit or the property" and includes "an agent, a resident manager, or a designated

43

property manager." RCW 59.18.030(16). Under the RLTA, a landlord may evict a tenant after 10 days' notice for breach of a material term of the lease agreement or after 3 days' notice for committing unlawful activity. RCW 59.18.650(2)(b), (c). A landlord cannot evict a tenant without a judicial eviction order, RCW 59.18.290, or evict tenants because they are victims of domestic violence, RCW 59.18.580(2). Both the landlord and tenant may invoke the jurisdiction of a superior court to enforce the rights and duties provided by the RLTA. RCW 59.18.050. The plain text of the RLTA indicates that it applies to the landlord and tenant, and not others. *See Gerlach v. Cove Apts., LLC*, 196 Wn.2d 111, 134, 471 P.3d 181 (2020) (declining to extend the RLTA to a tenant's guest). The State has not offered any evidence suggesting the respondents are owners, lessors, or property managers of rental homes. *Cf. Brewer v. Hill*, 25 Wn. App. 2d 844, 857, 525 P.3d 987 (2023) (resident who collected other residents' rent payments was not a "lessor" with authority to terminate a tenancy under the RLTA because he did not have authority to grant a lease).

The State's arguments that the respondents acted in the stead of the landlords are largely unsupported in this record. The State argues that the respondents "commandeered" the landlord's authority to determine who to evict by making participation mandatory and ordering or requesting landlords to evict tenants.

Appellant State of Wash.'s Br. at 69. Alternatively, they argue that the respondents

acted as "agents" of landlords in the same way. *Id.* at 71; *see* RCW 59.18.030(16).

These allegations raise concerning questions, but we see no facts in this record

that support an agency relationship here. "Agency" refers to a relationship where a

principal agrees to another (an agent) acting "on the principal's behalf, subject to the

principal's control," and the agent assents to do so. BLACK'S LAW DICTIONARY 76

(11th ed. 2019). "We have repeatedly held that a prerequisite of an agency is control

of the agent by the principal." *Moss v. Vadman*, 77 Wn.2d 396, 402, 463 P.2d 159

(1969). No facts in the record suggest any landlords control the respondents here

and there is nothing in the record to indicate that there exists an agent-principal

relationship here.

While the State claims that the respondents are forcing extrajudicial evictions,

what exists on this record does not show that *respondents* have violated the RLTA.

It is possible that *landlords* in the City have violated the RLTA, but the State has not

offered facts indicating the respondents are landlords or that the RLTA applies to

them. Based on the facts and allegations in the record at this stage, summary

judgment was proper as to the RLTA claims. We affirm the trial court on this issue.

CONCLUSION

We reverse in part, affirm in part, and remand to superior court for further

proceedings. The attorney general is authorized to bring this action under RCW

43.10.030(1) because this case involves matters of public concern in which the State has an interest. We therefore reverse because the respondents are not entitled to summary judgment on the basis of the attorney general's authority. Nor are the respondents entitled to summary judgment based on qualified immunity, municipal liability, the availability of injunctive relief, or the prima facie challenge to the housing discrimination claims. We therefore largely reverse. However, on this record, no facts indicate the RLTA applies to the respondents, so summary judgment was proper for the RLTA claims; we therefore affirm in part.

_____
Montoya-Lewis, J.

WE CONCUR:


_____      _____


_____      _____
                                          Gordon McCloud, J.


_____      _____
      Owens, J.

46

*State v. City of Sunnyside et al.*

No. 101205-5

MADSEN, J. (concurring)—While I agree entirely with the lead opinion based on the law, I write separately to emphasize that the procedural posture of this case does not invite us to opine on the merits of the underlying action, and I do not join the lead opinion's comments about the crime-free rental housing program (CFRHP). The CFRHP is authorized by the legislature. RCW 35.106.020. Lawmakers stated their intent in establishing this program is to encourage local governments, landlords, and tenants to work together to provide crime-free rental housing, which it determined is "beneficial to the public health, safety, and welfare." RCW 35.106.005.

The legislature established this voluntary program after finding that several cities in Washington had adopted similar programs. *See* FINAL B. REP. ON SECOND ENGROSSED SUBSTITUTE S.B. 5742, at 1, 61st Leg., Reg. Sess. (Wash. 2010). This indicates a desire for such programs and that its benefits led the legislature to

subsequently pass legislation creating the CFRHP.[1]  The legislature appears to have acted on the belief that both landlords and tenants benefit from these programs, which are designed to reduce crime, drugs, and gang activity on rental properties.[2]  *Id*. at 2.  The City of Sunnyside's ordinance establishing the CFRHP has a stated goal of "reducing crime and improving the quality of life for residents of rental housing."  SUNNYSIDE MUNICIPAL CODE 5.02.030(A).

I do not think it is the court's role to weigh in on the wisdom of such legislative policies.  *Rousso v. State*, 170 Wn.2d 70, 75, 239 P.3d 1084 (2010) ("It is not the role of the judiciary to second-guess the wisdom of the legislature.").  The lead opinion says it is providing context to support the allegation that Sunnyside's CFRHP is being enforced in a discriminatory manner.  As context, the lead opinion refers generally to examples of discriminatory practices used in the past, such as the existence of race-based zoning ordinances, discriminatory restrictive covenants, and redlining, some of which have been held to be unconstitutional or have been banned by Congress.[3]  *See* lead opinion at 23.  I

---

[1] The Senate voted unanimously for the passage of Second Engrossed Substitute S.B. 5742 and the House only had one vote in opposition.  *See* FINAL B. REP. ON SECOND ENGROSSED SUBSTITUTE S.B. 5742, at 2, 61st Leg., Reg. Sess. (Wash. 2010).

[2] Former Representative Jamie Pedersen testified in favor of Second Engrossed Substitute S.B. 5742, stating that "both landlords and tenant groups believe that this will be an important way to preserve public safety in cities, and also to help reintegrate those who have been released from correctional facilities after they've served their time."  H. FLOOR DEB., 61st Leg., Reg. Sess. (Feb. 28, 2010), at 33 min., 16 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2010021002.

[3] *See Shelley v. Kraemer*, 334 U.S. 1, 23, 68 S. Ct. 836, 92 L. Ed. 1161 (1948) (holding that state enforcement of racially restrictive covenants violates the Fourteenth Amendment to the United States Constitution); *Buchanan v. Warley*, 245 U.S. 60, 70-71, 82, 38 S. Ct. 16, 62 L. Ed. 149 (1917) (holding that racial zoning ordinances prohibiting people of color from moving to predominantly white neighborhoods was unconstitutional).  The Fair Housing Act in 1968 and

agree that context could lend support if we were deciding a facial challenge to the constitutionality of a statute or ordinance that is discriminatory on its face, but that is not the question before us.

The procedural posture of this case is an appeal of the trial court's grant of the defendants' motion for summary judgment based on lack of standing. Their primary theory for dismissal was that the State lacked the statutory authority to pursue this matter in any court for the same reasons it lacked standing in federal court. Because we are reversing and remanding the case to the superior court for further proceedings, I make no assumptions about the wisdom of the CFRHP. Courts should not substitute our social beliefs "for the judgment of legislative bodies, who are elected to pass laws." *Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963). Instead, our analysis should be confined to whether the trial court was correct in finding that no genuine issues of material fact existed when it granted the defendants' summary judgment motion based on standing. *Ehrhart v. King County*, 195 Wn.2d 388, 410, 460 P.3d 612 (2020) ("Summary judgment is appropriate only when there are no genuine issues of material fact.").

Beyond recognizing that the issues are of sufficient public interest to support an action by the attorney general, the allegations in this case do not require us to comment on the wisdom of the CFRHP itself. If Sunnyside failed to adhere to the requirements of

Equal Credit Opportunity Act banned the practice of racially motivated redlining. 42 U.S.C. §§ 3604(a)-(c), 3605(a); 15 U.S.C. § 1691(a)(1).

No. 101205-5
(Madsen, J., concurring)

CFRHP, which include landlord trainings, walk-throughs of rental properties to identify and eliminate crime hazards, and a commitment by landlords to maintain a crime-free premises, that does not mean the program itself is harmful but, rather, points to issues with its enforcement. Whether the CFRHP in Sunnyside is being operated in a discriminatory manner or in a manner that denies individuals due process is a question for the superior court. *Garcia v. Henley*, 190 Wn.2d 539, 544, 415 P.3d 241 (2018) ("This court generally cannot make findings of fact."). I agree with the lead opinion that there are genuine issues of material fact on several issues and that the trier of fact is in the best position to judge the credibility of witnesses and weigh the evidence. *In re Welfare of Sego*, 82 Wn.2d 736, 740, 513 P.2d 831 (1973). This court's general critique of the CFRHP is not necessary or helpful to reaching a decision on the merits of this dispute.

 With these considerations in mind, I respectfully concur.

Madsen, J.

Johnson, J.

Stephens, J.

Lawrence-Berrey, J.P.T.

4

No. 101205-5

GONZÁLEZ, C.J. (concurring in part and dissenting in part) — I agree with much in the well-written lead opinion.  Whether the City of Sunnyside has implemented its crime-free rental housing program in an unlawful and discriminatory manner is an issue for trial.  But in my view, the trial court also erred in dismissing claims brought under Washington's Residential Landlord-Tenant Act of 1973, ch. 59.18 RCW.  Accordingly, I respectfully concur in part and dissent in part.

I agree that the attorney general has the authority to appear in any case, such as this one, where the state has an interest.  *See* RCW 43.10.030(1); *City of Seattle v. McKenna*, 172 Wn.2d 551, 562, 259 P.3d 1087 (2011).  As article I, section 1 of our state constitution firmly states, governments "are established to protect and maintain individual rights." WASH. CONST. art. I, § 1.  The State, our elected officials, and municipalities have the power and the obligation to protect the health, safety, and well-being of everyone who lives in Washington. *See generally State v. Mountain Timber Co., 75 Wash. 581, 585-89, 135 P. 645 (1913), aff'd, 243 U.S. 219, 37 S. Ct. 260, 61 L. Ed. 685 (1917).*

Housing is critical to the health, safety, and well-being of both individuals and the community.  Housing is "necessary to secure other fundamental rights and interests. Access to employment, education, voting, health care, and most other public and private interests is greatly diminished, if not eliminated, when stable, suitable housing is unavailable." *Hundtofte v. Encarnación*, 181 Wn.2d 1, 23-24, 330 P.3d 168 (2014) (González, J., dissenting).  Housing is important to Washington, and Washington's attorney general has the power to protect fair access to it.

Washington also has a moral obligation to stop discrimination and deprivation of constitutional rights by those who act under color of law.  *See State v. Zamora*, 199 Wn.2d 698, 709, 512 P.3d 512 (2022) (quoting *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011)).  Discrimination is "a matter of state concern," and the legislature has declared "that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state."  RCW 49.60.010. If the State can prove what it has alleged, the city is operating its crime-free rental housing program in a discriminatory manner and that is absolutely something the attorney general has the power to challenge in court.

I agree with the lead opinion that the federal district court's summary judgment dismissal order does not have preclusive effect in state courts. That summary judgment order was based on the attorney general's standing in federal court. Federal courts, unlike state courts, are courts of limited jurisdiction. *Compare* U.S. CONST. art. III, § 2, *with* WASH. CONST. art. IV, §§ 4, 6. The fact the attorney general may not have had standing in federal court—a court he did not file this case in—is irrelevant to whether the case may be maintained in our general jurisdiction state courts.

I agree that genuine issues of material fact preclude summary judgment on the qualified immunity of the individual respondents. The State has offered evidence that Sunnyside police officers forced people to leave their homes through extrajudicial evictions. A well-trained police officer in Washington would know that tenants' and landlords' rights are spelled out in exacting detail in the Residential Landlord-Tenant Act and, at the very least, that an eviction requires notice and a judgment of a court. *See* RCW 59.18.055, .365-.410. A large body of judicial decisions also make that clear. *See, e.g.*, *Greene v. Lindsey*, 456 U.S. 444, 450-51, 102 S. Ct. 1874, 72 L. Ed. 2d 249 (1982); *Bridgeforth v. Bronson*, 584 F. Supp. 2d 108, 120 (D.D.C. 2008); *Carlstrom v. Hanline*, 98 Wn. App. 780, 789-90, 990 P.2d 986 (2000). For similar reasons, I agree with the lead opinion that the city is potentially subject to liability if the State can prove what it has demonstrated

3

sufficiently to survive summary judgment. The facts alleged suggest, at best, deliberate indifference to the statutory and constitutional rights of tenants.

I agree with the lead opinion that injunctive relief is available. "An injunction is inappropriate if it is absolutely clear that behavior will not reoccur, but courts must 'beware of efforts to defeat injunctive relief by protestations of reform.'" *Braam v. State*, 150 Wn.2d 689, 709, 81 P.3d 851 (2003) (quoting *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 312, 553 P.2d 423 (1976)). A pause in enforcement is not enough to evade an injunction.

I also agree with the lead opinion that material questions of fact preclude summary judgment on the allegations of housing discrimination. The State has offered sufficient facts of discrimination to go to the trier of fact.

I part company with the lead opinion, however, on whether the respondents are potentially liable under RCW 58.18.290 and .580(2). Based on the record here, I would allow these claims to go forward.

RCW 58.18.290(1) makes it "unlawful for the landlord to remove or exclude from the premises the tenant thereof except under a court order so authorizing." RCW 58.18.580(2) makes it unlawful for a landlord to "terminate a tenancy, fail to renew a tenancy, or refuse to enter into a rental agreement based on the tenant's or applicant's or a household member's status as a victim of domestic violence, sexual assault, or stalking." The State has presented considerable evidence that the

city and its agents have, either working with landlords or having effectively stepped into the landlords' position, violated both statutes.

Under the city code, all landlords in Sunnyside are effectively required to participate in the crime-free rental housing program. Sunnyside Municipal Code (SMC) 5.02.030(A)(3); CP at 494-97. Without any prior judicial review, Sunnyside police are empowered to direct landlords to begin eviction proceedings. SMC 5.02.030(F). All participating landlords are required to pledge, under penalty of perjury, that they will participate in the program and serve an eviction notice within three business days of being notified in writing to do so by the police. CP at 494-97. An appeal under the ordinance is available only to the landlord and is made to the chief of police. SMC 5.02.030(F). Landlords who violate the program can lose their right to rent property. SMC 5.02.060; CP at 495. According to a news article, a police commander said, "'This is not a voluntary program . . . this has real penalties.'" CP at 449.

The State offered evidence—not yet tested in trial—that supported the commander's characterization. One landlord told her tenants that she had to evict them because police told her she would be fined $1,000 a month otherwise. CP at 303. Police told those tenants to vacate the property by midnight and leave town. CP at 304. Another tenant was forced to leave her home while pregnant, even

though her landlord said she did not want to evict her. CP at 769-70. The State

has offered evidence the landlord felt compelled to do so by the police. CP at 770.

The State has presented significant evidence that the city has, to no small

extent, inserted itself into the landlord/tenant relationship. *See* CP at 462, 661,

759, 769, 781. There is also significant evidence that the city and its agents

exercised this power in the face of domestic violence and to the detriment of

victims. CP at 591-92, 604-06, 665-67, 799. Evicting a tenant because they are

the victims of domestic violence is illegal and will often put the victim in a worse

position. RCW 58.18.580(2).

The State also offered other evidence that landlords were using the program

to do real harm. One tenant submitted a declaration that her landlord had pressured

her for sex. CP at 781. When the tenant declined, he called the police and falsely

accused her and her son of theft. CP at 781. The police came and ordered the

family to leave within two days without giving them the opportunity to go to court

and contest the grounds for their eviction in violation of tenant protections set forth

in chapter 58.18 RCW. CP at 782. If proved, a jury could find the police were

acting as a landlord's agent. Landlords' agents are held to the same standard as

landlords under RCW 58.18.030(16).

Simply put, the State has offered significant evidence that officers acted as

agents of a landlord and that the city is requiring landlords to give city agents the

power to trigger evictions.  SMC 5.02.030; CP at 494, 776.  A landlord who evicted a person without a court order or because of domestic violence would be in clear violation of chapter 58.18 RCW.  We should hold the city and its agents to the same standard.  Accordingly, I would allow the State to take its claims under the Residential Landlord-Tenant Act to trial.

I respectfully concur in part and dissent in part.

González, C.J.

Yu, J.